**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Plaintiff.** | § | |
| | § | |
| **v.** | § | CRIMINAL NO. A-22-CR-053 DAE |
| | § | |
| **FRANKLIN BARRETT SECHRIEST,** | § | |
| | § | |
| **Defendant.** | § | |

## GOVERNMENT'S SENTENCING MEMORANDUM

TO THE HONORABLE JUDGE OF SAID COURT:

The United States of America, by and through the undersigned Attorneys for the Government, hereby files this Sentencing Memorandum for consideration by the Court in determining the Defendant's sentence in this case.

In sum, the United States urges the Court to impose a sentence of 120 months followed by a 3-year term of supervised release. An upward variance is necessary to reflect the seriousness of the Defendant's hateful, destructive attack on the Jewish community, to account for the characteristics of the Defendant and protect the community from the Defendant, who has committed other acts of racially-motivated violence and failed to show contrition, and to deter others from engaging in anti-Semitic and racist violence. A sentence of 120 months imprisonment would satisfy the purposes of sentencing as envisioned by the Sentencing Guidelines and 18 U.S.C. § 3553.

## I.     DEFENDANT'S CONVICTIONS

On April 6, 2023, Defendant pleaded guilty to Counts 1 and 3 of the Indictment charging him with:

> **Count 1:     18 U.S.C. § 247(c)**
> **Hate Crime – Damage to Religious Property**

*Statutory Sentencing Range:*

> Imprisonment:  Up to 20 years;
> Supervised Release:  Up to 3 years;
> Fine:  Up to $250,000 or twice the gross loss;
> Restitution

> **Count 3:     18 U.S.C. § 844(i)**
> **Arson**

*Statutory Sentencing Range:*

> Imprisonment:  Minimum 5 years, up to 20 years;
> Supervised Release:  Up to 3 years;
> Fine:  Up to $250,000 or twice the gross loss;
> Restitution

## II.     PRESENTENCE INVESTIGATION REPORT

The United States has reviewed the PSR pertaining to Defendant and has no objections to the PSR or to the Guideline calculation set forth in the PSR.

## III.     FACTS OF DEFENDANT'S CASE

1.     On October 31, 2021, Defendant SECHRIEST, by the use and attempted use of fire, intentionally and maliciously defaced, damaged, and

destroyed, and attempted to deface, damage, and destroy, religious real property, namely, Congregation Beth Israel, a synagogue located in Austin, Texas, because of the race and ethnic characteristics of any individual associated with that religious property.

2.      Congregation Beth Israel was at the time, and remains, a Reform Judaism synagogue serving Jewish families in Austin, Texas (hereinafter "the Synagogue"). Congregation Beth Israel was established in 1879 and is the oldest synagogue in Texas.

3.      On October 31, 2021, video surveillance from the Synagogue's security system shows a dark SUV driving into the parking lot at around 9:00 pm. Defendant SECHRIEST, the driver and sole occupant of the vehicle, parked the SUV and got out. Defendant SECHRIEST was wearing green utility pants, a black shirt, and a mask. Shortly after he got out of the SUV, the vehicle began rolling backwards, so Defendant SECHRIEST jumped into the SUV to stop the car's backward motion. Defendant SECHRIEST then got out of the SUV a second time, leaving the driver's side door open, and walked around the front of the SUV towards the Synagogue's sanctuary with a green gas container in one hand and a roll of toilet paper in the other. He then walked back down the walkway toward the Synagogue's sanctuary entrance. Seconds later, Defendant SECHRIEST set fire to the Synagogue's sanctuary, then swiftly ran away and drove off in his SUV.

4.      Shortly after the fire was set, the Austin Fire Department (AFD) responded to a 9-1-1 call and was on scene within 9 minutes.   AFD arson investigators examined the scene and concluded that the fire was intentional and could have destroyed the Synagogue.   They observed burn patterns consistent with the use of accelerants and ruled out all other ignition sources other than an open flame introduced by a person.

5.      Additional surveillance video from the Synagogue, recorded three days earlier on the evening of October 28, 2021, showed Defendant SECHRIEST's dark SUV entering the Synagogue parking lot near the sanctuary.   Defendant SECHRIEST, the driver and sole occupant of the vehicle, drove around to the front entrance of the Synagogue's Child Development Center (CDC).   Surveillance footage of the area in front of the CDC shows Defendant SECHRIEST shining what appears to be a cellphone flashlight toward the entrance.   The video also clearly shows the SUV's license plate number, which was used to identify the vehicle as a black Jeep Cherokee registered to Defendant SECHRIEST's mother.

6.      On or about November 10, 2021, the FBI executed federal search warrants issued by the United States District Court for the Western District of Texas for Defendant SECHRIEST's residence in San Marcos, the Jeep Cherokee SUV, Defendant SECHRIEST's phone, and Defendant SECHRIEST's person. During the searches, agents discovered several items linking Defendant SECHRIEST to the

Synagogue fire, including (1) green utility pants and boots matching the clothes Defendant was wearing as seen on the October 31 video surveillance footage; (2) an American Express card that was used at a local store to purchase a green gas container matching the container seen in the video; and (3) three large bottles of lighter fluid, three empty 33oz glass bottles, and storm proof matches, which were consistent with materials that could be used and combined to produce destructive devices known as Molotov cocktails.

7.     In addition, during the execution of the search warrant for Defendant's residence, agents recovered from Defendant SECHRIEST's bedroom and the family dining room several journals belonging to Defendant SECHRIEST that contained numerous entries in his handwriting.  In an entry from a journal found in Defendant SECHRIEST's bedroom and dated October 28, 2021 (the same date he was seen on surveillance footage casing the Synagogue), Defendant SECHRIEST had written the phrase "*scout out a target*."  Another entry in the journal, dated October 31, 2021, states "*I set a synagogue on fire*" (**Exhibit 1**):



Defendant SECHRIEST's journal entries in the first few days of November 2021 show that he was actively monitoring media reports to track the progress of the investigation into the Synagogue arson.

8.    Defendant SECHRIEST intentionally targeted the Synagogue for damage and destruction because of the race and ethnic characteristics of individuals associated with the Synagogue, namely, Jewish people and people who worshipped at the Synagogue, and because of his hatred of Jews.  Defendant SECHRIEST's journals are replete with virulent anti-Semitic statements and views.  In one entry, Defendant SECHRIEST said he had to listen to "*a third-hand speech about the holocaust and 'hate*'" and that he "*had a long talk with mom about Jews controlling the media*."  He later wrote that he listened to another Holocaust survivor's speech and that "*They [Jews] do control the media*."  In a June 4, 2019 entry, Defendant SECHRIEST stated that he dressed like a neo-Nazi.  On August 15, 2019, Defendant SECHRIEST wrote that he "*Learned why Jews cause ALL the suffering*."  In his journals, Defendant SECHRIEST claimed membership in white supremacist organizations, including the Asatru Folk Assembly (AFA), which preaches racist doctrines based on a belief in ethnic Germanic superiority.  Defendant SECHRIEST also stated that he planned to get a ring with Thor's Hammer, a symbol often appropriated by neo-Nazi groups.

9.    Defendant Sechriest also possessed several decals expressing anti-

Semitic messages.  One decal in particular expressed deep hatred for and threatening

language about Jews.  The decal featured images of a police officer, a doctor, and a

person behind a pulpit or bimah, each with a Star of David on them, each with a red

"X" over the face.  Above the three figures, the sticker reads in bold and with capital

letters, "***Would you <u>KILL THEM ALL</u> to seize your rights?***" and below the figures,

between two red swastikas, it reads "***The price of freedom is paid in BLOOD***."



10.     At the time of the fire, the real property of the Synagogue was used in

interstate commerce and used in activities affecting interstate commerce.   In

particular, the Synagogue operates and maintains its CDC that runs preschool

programs open to both members and non-members of the Synagogue.  The CDC is structurally connected to the sanctuary portion of the Synagogue that was set on fire. According to the CDC's webpage on the Synagogue's website (https://www.bethisrael.org/cdcatcbi.html), at the time of the fire, the CDC operated preschool programs, charged tuition for its programs, and was open to both members and non-members of Congregation Beth Israel.

11.    Defendant SECHRIEST intentionally defaced, damaged, and destroyed, and attempted to deface, damage, and destroy the Synagogue, religious real property, because of the race and ethnic characteristics of individuals associated with that religious property. Defendant SECHRIEST intentionally set fire to the Synagogue causing damage to the religious real property and personal property of the Synagogue.

## IV.    ADDITIONAL RELEVANT CONDUCT

Aggravated Robbery – September 10, 2021 (**Exhibit 2**)

1.    On or about September 10, 2021, on the campus of Texas State University, San Marcos, Texas, Defendant committed an armed robbery of 4 persons, specifically, 3 Black victims and 1 Hispanic victim.  Defendant concealed his face, approached the victims, displayed a firearm, and ordered them to produce their wallets and other valuables.

2.      During the November 10, 2021, search of Defendant's residence, credit cards belonging to two of the robbery victims were found in Defendant's possession. Defendant specifically targeted the victims because of their race.  Defendant was not arrested or charged with this robbery because it was unsolved until Defendant's journals were reviewed.

3.      In one of his journals, in journal entries dated September 10 and 12, 2021, Defendant admitted to the robbery in racist terms, stating that he "mug[ged] a bunch of Nignogs":







In an entry dated September 29, 2021, Defendant stated:



Molotov Cocktails and Firearms (**Exhibit 4**)

4.      In his journals, Defendant wrote about making Molotov cocktail explosive devices.  In one entry, he expressed concern that his mother may have found one of his Molotov cocktails.  This history helps establish that Defendant's possession of Molotov cocktail precursors as noted in Section II(6) above was not accidental or unintentional:  he intended to engage in more violent criminal conduct and was preparing to escalate.

5.      Defendant also wrote about obtaining and using firearms.

Defendant's Expressions of Hate and Other Criminal Conduct (**Exhibits 3 & 5**)

6.      Defendant's hate-filled journal entries and other statements of hate are aggravating factors in and of themselves.  What makes this Defendant different from

other offenders before this Court is that he, by his own detailed admissions, has acted out on his hateful predilections.

Defendant's Lack of Remorse (**Exhibits 6 & 6A**)

7.      While in pretrial custody, and before pleading guilty, Defendant wrote what can be best described as a missive against Congregation Beth Israel and the Anti-Defamation League (ADL).  In his note, he exclaimed that "[Congregation Beth Israel] and the ADL can rot in hell for buying off my first lawyer[,]" continuing his embrace of conspiratorial and hateful thinking.  He went on to claim that the FBI, "egged on" by ADL, would show no mercy to him.  The Defendant's own statements show that he has no remorse for his attack on CBI, and in fact blames CBI for his incarceration.


## V.      LIKELIHOOD OF RECIDIVISM AND DANGER TO SOCIETY

Defendant has harbored well-documented anti-Semitic and racially biased beliefs for quite some time and has shown a willingness to act violently on his hateful thoughts and beliefs. He has not only set fire to the CBI Synagogue, he has manifested a strong interest in producing Molotov cocktails that could be used to damage and destroy other places of worship, he committed a robbery of Black and Hispanic victims, and demonstrated an interest in associating himself with other like-minded violent bigots. Defendant was attending Texas State, and was academically

high-performing in high school, meaning he had the capacity to knowingly embrace his hateful, violent agenda.

Even while in custody for these offenses, Defendant has shown no remorse or regret for his conduct.  To the extent he has shown regret, it is primarily regret that he has been caught and incarcerated.  Defendant has not engendered confidence that he will refrain from violently acting on his hateful thoughts and beliefs in the future.

## VI.   ANALYSIS OF 18 U.S.C. § 3553(a) FACTORS

1.   Nature and Circumstances of the Offense.

There is no question that Defendant's offenses are extremely serious and deserve substantial punishment.  Defendant's commission of arson and a federal hate crime were specifically directed toward people of the Jewish faith and Jewish religious property. Defendant's crimes were not only physically destructive but were also intended to cause, and did cause, severe emotional and psychological damage. Defendant desecrated a Jewish place of worship.  Defendant intended his crimes to terrorize the Jewish community, and he selected as his target the oldest synagogue in Texas, a choice that only magnified the impact of his crime.

It is noteworthy that Defendant committed his hate crime only days after a hate group came to Austin and displayed an anti-Semitic sign on an overpass on a major Austin highway. ("'Vax the Jews' banner hung over bridge near Austin JCC

[Jewish    Community    Center],"    Jerusalem    Post,    October    25,    2021,
https://www.jpost.com/diaspora/antisemitism/vax-the-jews-banner-hung-over-
bridge-near-austin-jcc-682992).    The timing of Defendant's attack amplified the
impact of his crime.

Defendant's use of fire as his chosen means of destruction was particularly
intimidating, insidious, and psychologically devastating. The harm caused by fire
extends well beyond the physical damage.  Fire often fully obliterates and consumes
what it burns, leaving virtually no trace. In the context of Defendant's hate crime,
there seems to be symbolic significance to that.  And here, it was only the quick
action of a good Samaritan who happened to be walking by and the Austin Fire
Department that managed to save the rest of the Synagogue from destruction.  The
destruction wrought by Defendant's crime was still extensive, preventing the CBI
congregation from using its community space.

The many victim impact statements submitted to the Court reflect the
emotional and psychological damage inflicted by Defendant's crimes. Defendant's
crimes had a devastating impact on the CBI congregation and the larger Austin
Jewish community.   Despite the harm done to them, however, they have not
succumbed to the hate; they have emerged from this horrific experience stronger
than ever and have refused to allow Defendant the satisfaction of undermining their
enduring faith, spirit, and fortitude.

2.     <u>History and Characteristics of the Defendant</u>.

Defendant has a history of hate toward the Jewish community and racial minorities. He not only harbored these ideas in his mind, but he went so far as to commit them to paper and, more dangerously, to act on them. In addition to his crimes against CBI and his armed robbery, he has admitted in his journals to engaging in other acts of hate-motivated violence (*see* **Exhibit 5**). This track record of violent activity shows that the Defendant is more than willing to enact his violent, racist agenda should he be released.

Not only has Defendant repeatedly and violently acted upon his hateful ideology, but he has sought opportunities to make himself a greater danger to the community by gaining access to training and weapons. Prior to August 2021, Defendant had no connection to the State of Texas. Defendant moved to Texas specifically to attend Texas State University and to join the Texas State Guard. Defendant became fascinated with the Texas State Guard and believed it would give him access to like-minded people who shared his hate. Defendant believed that joining the Texas State Guard would also give him the opportunity to train with firearms and other weapons. In addition to seeking opportunities to learn to use weapons, he also made efforts to arm himself and to build other destructive devices. Defendant owned several firearms, and his car was filled with the materials for building Molotov cocktails. Defendant was already dangerous, and he was in the

process of making himself a greater danger to the community by arming himself thoroughly and learning how to use his assembled arsenal.

Although Defendant was 18 years old when he committed his crimes, his youthfulness is no measure of his maturity, intelligence, or judgment.  Defendant's anti-Semitic and racial animosity appear to have been well-developed by the time he was in high school, as demonstrated from his journals.  These vile beliefs consumed him for a long period of time and inspired him to reduce them to writing, and to plan ways to violently act upon his beliefs.

Defendant's journals also document a history of manipulative behavior by Defendant that he seems to relish (*see* **Exhibits 6 & 6A**). Defendant has shown a capacity to manipulate others and has repeatedly expressed a willingness to use his youth and mental health as a shield against meaningful consequences for his violent and hateful acts.  Before his arrest, he documented throughout his journals multiple instances in which he lied or used his mental health as an excuse to get out of trouble. *Id.*  Then, following his arrest, and throughout his time in jail, he made multiple false and misleading statements, and expressed a willingness to lie to avoid incarceration or other consequences.  *Id.*  Given his history of hatred, violence, and manipulation, it is difficult to give credence to any claim of remorse or plea for leniency that Defendant may make.  While Defendant's chronological age is a mitigating factor, it should not overshadow the depth of his hate or his willingness to act on it.  Taken

together, Defendant's repeated acts of racially motivated violence, his expressed desire to make himself a more dangerous and effective criminal, his intelligence, and his strong capacity for manipulation of others all demonstrate that an upward variance is necessary based on the risk the Defendant poses to the community and his violent tendencies.  The Fifth Circuit and other courts have frequently cited these kinds of characteristics in affirming upward variances, even in light of other mitigating factors.  *See, e.g.*, *United States v. Scott*, 738 F. App'x 425, 426 (5th Cir. 2019) (affirming an upward variance in an arson case based on the risk posed by the defendant and uncharged conduct that demonstrated violent tendencies); *United States v. Hall*, 404 F. App'x 742, 744 (4th Cir. 2010) (affirming an upward variance in a case involving a *threat* of an arson in light of the defendant's violent tendencies and the seriousness of the offense).  This Court should vary upward on the same basis.

3.  <u>The Need for the Sentence Imposed to Reflect the Seriousness of the Offenses, To Promote Respect for the Law, and To Provide Just Punishment for the Offenses</u>

This offense is among the most serious of destructive offenses and is especially serious considering Defendant's hateful motivations and desire to terrorize the Jewish community.  Hate crimes that target religious institutions, such as CBI, aim right for the heart of a community, and have a heightened symbolic

value in the eyes of perpetrators like the Defendant.  As demonstrated by the Victim Impact Statements, these crimes also have a lasting impact on the communities they target because they destroy a place of safety and alter the pattern of life for the community for months and years.  Because of this, the Fifth Circuit has recognized that in cases such as this, an upward variance is often necessary to fully reflect the seriousness of the offense, and to punish defendants for their particularly heinous and hateful goals.  *United States v. Crimiel*, 547 F. App'x 633, 634 (5th Cir. 2013) (affirming an upward variance in a § 247 case based on the need to reflect the "seriousness of the offense" because the defendant's "goal in attacking the churches was to strik[e] fear in the community."); *United States v. Wolfe*, 2022 WL 17609467, at *8 (6th Cir. 2022), cert. denied, 143 S. Ct. 820 (2023) (affirming an upward variance in a hate crime based on the seriousness of the offense and impact on victims, even in light of defendant's mitigating mental health issues).  On this basis alone, an upward variance would be justified.

Defendant's conduct indicates that he has little respect for the law and is more than willing to flout the law to engage in violent behavior and to attack the safety, security, and well-being of the Jewish community and others.  His missive, in which he blamed the ADL and the Synagogue for his incarceration, demonstrates a  lack of remorse.  The sentence imposed should reflect the extent of the physical and psychological damage inflicted by Defendant and his lack of remorse.

4.     <u>The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct</u>

Deterrence is an important aspect of sentencing in a case like this. Sadly, there are many others who hold and share Defendant's vile, hateful beliefs against religious and racial groups, and who may be willing to act on those beliefs. A substantial sentence is warranted to deter others from acting on those vile, hateful beliefs. A sentence perceived as lenient will do nothing to discourage others who are inclined to act on their hatred from engaging in similar crimes; the risk of adverse consequences will not outweigh the "reward" they value. Courts have repeatedly recognized the special need for deterrence in hate crime and arson cases in affirming upward variances.  *See Wolfe*, 2022 WL 17609467, at *8 (affirming an upward variance in a hate crime case based on the need for deterrence, despite the defendant's mental health issues); *United States v. Escoto*, 842 F. App'x 527, 532 (11th Cir. 2021) (affirming an upward variance in an arson case based on the need for deterrence).

There is a special need for deterrence of anti-Semitic acts both in the Austin area and generally.  Around the time of Defendant's crime, there were a number of anti-Semitic incidents in and around Austin.  *See* Andrew Weber, "2021 was a record year for antisemitism in Austin," KUT News (Apr. 27, 2022) (noting that there were 44 documented antisemitic incidents in the Austin area in 2021, the most of any city in    Texas)    [https://www.kut.org/austin/2022-04-27/2021-was-a-record-year-for-](https://www.kut.org/austin/2022-04-27/2021-was-a-record-year-for-)

antisemitism-in-austin.   Unfortunately, these kinds of incidents have continued in and around the Austin area, jeopardizing the safety and security of the Jewish community.   *See, e.g.*, Carissa Lehmkuhl, "Jewish community responds after multiple antisemitic incidents reported in West Campus," Fox 7 Austin (Sept. 22, 2023)   https://www.fox7austin.com/news/ut-austin-antisemitic-incidents-reported-jewish-community-responds.   These kinds of incidents are not unique to Austin either, with anti-Semitic hate crimes and acts on the rise across the United States. *See* Russell Contreras, Anti-Jewish, anti-LGBTQ hate crimes spiked in 2022, Axios (Oct. 18, 2023) (citing FBI hate crime statistics showing a 36% increase in anti-Jewish hate crime in 2022) https://www.axios.com/2023/10/18/anti-jewish-anti-lgbtq-hate-crimes-2022-fbi.   In light of this growing tide of anti-Semitism, a sentence of 120-months for this Defendant is essential to deterring anti-Semitic violence, and demonstrates to others that these acts will be punished to the full extent of the law.

5.    The Need for the Sentence Imposed to Protect the Public from Further Crimes of Defendant.

A lengthy sentence will remove Defendant from society for a significant period of time and protect the public from him.   At the time of his arrest, Defendant was clearly gearing up to commit additional violent crimes based on his hate.   Even while in custody, Defendant has expressed continued hatred against persons of the

Jewish faith, as demonstrated by his anger toward the Anti-Defamation League.  The longer Defendant is in custody, and under the watchful eye of the Court and Probation upon release, the better for the protection of society.

## VII.   <u>EXHIBITS</u>

In support of this sentencing memorandum, the United States submits the following attached exhibits:

Exhibit 1    Defendant's Journals:  **Corroborated Criminal Acts**

Exhibit 2    Defendant's Journals:  **Armed Robbery, September 10, 2021**

Exhibit 3    Defendant's Journals:  **Criminal Acts Not Yet Corroborated**

Exhibit 4    Defendant's Journals:  **Weapons**

Exhibit 5    Defendant's Journals:  **Defendant's Expressions of Hate**

Exhibit 6    Defendant's Statements:  **Manipulation and Lack of Remorse**

Exhibit 6A (Sealed)         Supplement to Exhibit 6

## <u>CONCLUSION</u>

The applicable guideline range in this case is 60-63 months. The United States contends that a sentence within this guideline range is insufficient, and less than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2).  For the tremendous damage done by Defendant – physically and emotionally – and his

targeting of a place of worship that was intended as an expression of his deep-seated hatred of persons of the Jewish faith, a sentence outside and above the applicable guideline range would be reasonable and appropriate under the circumstances of this case.

The United States urges the Court to vary upward from the applicable guideline range under 18 U.S.C. § 3553(a) and impose a total term of imprisonment of 120 months, followed by the maximum term of supervised release, and full restitution.

Respectfully submitted,

JAIME ESPARZA
United States Attorney
Western District of Texas

KRISTEN M. CLARKE
Assistant Attorney General
U.S. Department of Justice
Civil Rights Division

*/s/ Matthew Devlin*

*/s/ Andrew Manns*

_____

_____

MATTHEW DEVLIN
Assistant United States Attorney

ANDREW MANNS
Trial Attorney

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 20, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Daniel H. Wannamaker, Esq.
1012 Rio Grande Street
Austin, Texas 78701
(512) 236-9929
Fax (512) 233-5979
State Bar No. 20834300
Email:  dhw@wannamakerlaw.com
*Attorney for Franklin Barrett Sechriest*

/s/  *Matthew Devlin*

_____

MATTHEW DEVLIN
Assistant United States Attorney